| | | |
|---|---|---|
| CHARLENE SMITH, | : | |
| Plaintiff | : | CIVIL ACTION NO. |
| v. | : | 3:05-CV-1149 (JCH) |
| | : | |
| CINGULAR WIRELESS, | : | AUGUST 18, 2008 |
| Defendant | : | |

### RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE [Doc. Nos. 54, 68]

Plaintiff Charlene Smith brings this action against her former employer, Cingular Wireless ("Cingular"). Smith, an African-American woman who suffers from back problems, claims that Cingular unlawfully terminated her employment because of her race and disability, and in retaliation for complaints about discrimination that she made to management. Smith also asserts that, prior to her termination, she had been subjected to a hostile work environment.

The defendant has filed a Motion for Summary Judgment. For the reasons that follow, the Motion is **GRANTED IN PART** and **DENIED IN PART**.

### I.    STANDARD OF REVIEW

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgement as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000). Once the moving party has met its burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor in order to defeat the motion.

Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgement is sought. Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38. "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party." Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000). "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the jury. Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

## II.    FACTUAL BACKGROUND[1]

Smith began her employment with Cingular on August 30, 1999.  She was

initially hired as a Retail Store Administrator.  Then, in January of 2000, she became a

Customer Service Representative at the Cingular store in Newington, Connecticut.

Around the time of this position change, Smith's immediate supervisor became

Trevor Taylor, the Newington Store Manager.  Smith Dep. at 31, 35.  Relatively quickly,

---

[1] For the purposes of the instant motion, the court accepts facts undisputed by the parties as true
and resolves disputed facts in favor of the plaintiff where there is evidence to support her allegations.
    The court notes that Cingular has filed a Motion to Strike much of the evidence offered by the
plaintiff in support of her claims.  See Doc. No. 68.  Except as otherwise noted, and putting aside Smith's
hostile work environment claim, the court will assume that all of Smith's evidence is properly considered in
evaluating the Motion for Summary Judgment.  As will be discussed later, even if this evidence is
considered, Smith's claims (other than her hostile work environment claim) do not survive summary
judgment.
    Smith's hostile work environment claim is more complicated.  However, much of the evidence
targeted in the Motion to Strike is not relevant to the hostile work environment claim.  Indeed, of the many
exhibits that Cingular seeks to strike, only Smith's Affidavit contains anything of significance with regard to
this claim.  Accordingly, in evaluating the hostile work environment claim, the court will not rely on any of
the evidence the defendants seek to strike, other than Smith's Affidavit.
    The court will, however, consider Smith's Affidavit over the defendant's objections.  In the Motion
to Strike, Cingular contends that the Affidavit should be excluded as a "sham."  See Defendant's Motion to
Strike at 3.  However, the sham affidavit rule simply prohibits a party from relying on an affidavit that
contradicts her prior sworn testimony.  Hayes v. N.Y. City Dept. of Corrs., 84 F.3d 614, 619 (2d Cir. 1996).
If there is no conflict, a party is free to submit an affidavit that amplifies or explains her prior testimony.
Langman Fabrics v. Graff Californiawear, 160 F.3d 106, 112 (2d Cir. 1998).  Cingular identifies no aspect
of Smith's Affidavit that contradicts her deposition testimony, and thus the court sees no basis to strike.
Indeed, Cingular's argument appears to amount to nothing more than the claim that Smith's Affidavit
should be stricken because it is the affidavit of a witness whose deposition testimony was also taken.
    Cingular alternatively asks that Smith's Affidavit be stricken as conclusory.  Defendant's Motion to
Strike at 3.  Perhaps ironically, however, Cingular offers absolutely no elaboration on this point.  See id.  In
any event, the court has reviewed Smith's affidavit, and it has not relied on the portions that the court
deems conclusory (e.g. paragraph 38, and the other paragraphs to the extent they offer legal
conclusions).  The portions the court does rely upon are not conclusory.
    In its Reply Brief in support of it Motion to Strike, Cingular notes that aspects of Smith's Affidavit
parrot her deposition testimony.  Defendant's Reply Brief in Further Support of Motion to Strike at 2.
Curiously, Cingular seeks to strike these allegations as cumulative.  Yet, this aspect of the Motion to Strike
is completely moot in the context of a Motion for Summary Judgment: either the Affidavit does mimic the
deposition testimony, in which case the plaintiff's evidence is before the court no matter what, or the
Affidavit adds to the deposition testimony, in which case the Affidavit is not cumulative.
    The Reply also surmises, without elaboration, that many of plaintiff's statements in her Affidavit
should be stricken because they are self-serving and subjective.  Id. at 3.  This contention lacks merit.
Certainly, the fact that plaintiff's testimony helps her is not a valid reason to strike, particularly where
plaintiff is simply relating her recollection of the relevant events.  And while some paragraphs in the
Affidavit do refer to Smith's subjective beliefs, this testimony is quite relevant to the hostile work
environment claim and should not be stricken.

the relationship between the two began to sour.  <u>Id.</u> at 44.  The precipitating event

appears to have taken place on February 26, 2000, when Smith strained her back in a

workplace accident.  Smith Dep. at 44, 46, 50.  Smith saw a doctor, and the doctor

drew up some restrictions that permitted Smith to return to work.  <u>Id.</u> at 49.  However,

Taylor generally refused to accommodate those restrictions, making comments

indicating that he thought Smith was perfectly capable of lifting things like boxes of

phones.  <u>Id.</u> at 58-59.  Smith also felt that Taylor started treating her different than the

other employees at the store, such as by disciplining her for small work violations that

he let slide for other employees.  <u>Id.</u> at 44; Smith Aff. ¶¶ 9-11, 14, 22-24.  For example,

on two occasions, Taylor disciplined Smith for being late, even though she had called

ahead to warn him that she had good cause for her tardiness.  Meanwhile, some of her

co-workers would be late every day, would take two-hour lunches, and would frequently

leave early, yet Taylor would never discipline these co-workers, even after Smith

brought these issues to his attention.  Smith Dep. at 178.

    Taylor would also do other things that Smith found to be harassing.  For

example, on March 20, 2000, Taylor reprimanded her on the sales floor, in front of

customers and co-workers, because he believed she was not meeting deadlines.  Smith

Aff. ¶ 11.  Moreover, although Smith was not given any "warning" during that incident,

Taylor (along with his boss) later accused Smith of still not meeting deadlines despite

having previously been warned about the issue.  <u>Id.</u> at ¶¶ 14-15.  Additionally, starting

in August 2000, Taylor began assigning Smith numerous tasks, yet scheduled few

salespeople to work with her. The result was that Smith found completing her tasks to

be difficult and stressful, and at times nearly impossible.  <u>Id.</u> ¶ 21.

Taylor was not the only Cingular employee who made negative comments about Smith or otherwise did things that upset her. Brandon Merrick, a sales representative, was incredulous that Smith was unable to bend down to pick up boxes. Smith Dep. at 62. John O'Connor, the lead sales representative, made similar comments. Id. at 61. In fact, O'Connor's tensions with Smith went deep enough that, on May 25, 2001, he sent Taylor an email expressing disgust with the fact that Smith had been complaining about O'Connor's management style. Plaintiff's Exh. 9. O'Connor explained that he was "mentally drained from dealing with her on [a] day to day basis," and he told Taylor that something needed to change. Id. Although Smith was not copied on this email, she later discovered it when she stumbled upon a file about her that Taylor had been maintaining in his office. Smith Dep. at 196-97.

Because of these various incidents, Smith made several complaints about discrimination during the course of her employment. At one point, Smith spoke to a representative from her union to discuss the negative comments that Taylor, O'Connor, and Merrick had been making. Id. at 64-66. That representative in turn spoke to Taylor, but the negative comments did not completely abate. Id. Smith also spoke to Lewis Martin, a supervisor above Taylor in the corporate hierarchy. Id. at 38, 65. Martin also spoke to Taylor and instructed him to accommodate Smith's condition, but Taylor still did not do so, nor did he fully cease making comments. Id. at 58-59. At some point, Smith got tired of the comments, and so she just ignored her doctor's restrictions and lifted boxes herself when co-workers were not available to help her. Id. at 66-67.

Notwithstanding this mild acquiescenece, Smith continued to lodge complaints

about Taylor and others.  At one point (the exact time frame is unclear), Smith

contacted a third representative from her union to complain about race and disability

discrimination.  Smith Dep. at 189.[2]  Smith also brought similar complaints to still more

union representatives at some undetermined point in 2000, and again in March 2001.

Id. at 107-08.  Finally, in late July 2001, Smith made a complaint about Taylor to Steve

Impey, one of Taylor's superiors.  Id. at 125-26.

This last complaint seems to have prompted action.  In early August of 2001,

Taylor was called into a meeting with Impey and two other of Taylor's superiors in the

company, Rich DiSanti and Michael Sparrow.  Cont'd Taylor Dep. at 21-22.  At the

meeting, Taylor's superiors told him that Smith had made complaints of racial

discrimination against him, and they questioned him about his interactions with her.

They also warned him that he needed to make sure he avoided racial discrimination.

Id.  Taylor subsequently resigned from the company, and his last day was September 6,

2001.  He was replaced by David Spafford.

Several weeks later, on September 28, 2001, an incident occurred at the

Newington store which ultimately led to Smith's termination.  Monte Jennings, the

boyfriend of Smith's daughter (Latrice Jones), came into the store to purchase a new

cell phone.  Smith Dep. at 141-42.  Jennings left with new phones for both himself and

for Jones.  According to Cingular's electronic records, while Jennings was being helped,

someone at the Newington store accessed both Jennings's account and Jones's

account to active new cell phones for them.  See Defendant's Exh. H, I.

---

[2] The record appears to be silent regarding exactly when these complaints were made.

Cingular has a policy that bans employees from accessing family members' accounts "without a valid business reason and prior approval." Defendant's Exh. C. Thus, if Smith had been the representative who accessed Jennings and Jones's accounts, she would have been in violation of this policy.[3]  However, Smith denies being the representative who completed these transactions. Smith Aff. ¶ 31. Instead, she maintains that the store was very busy that day, and so Jennings was primarily assisted by Ryan DiPietro, the only other employee in the store at the time. Smith Dep. at 142-51.

Notwithstanding Smith's denials, company records at least suggest the possibility that Smith was involved in the transaction. Indeed, Cingular's computer system shows that the accounts were activated by someone using Smith's login information, and working from her computer. Defendant's 56(a)(1) Stat. at ¶ 15; Plaintiff's 56(a)(2) Stat. at ¶ 15. Additionally, Smith acknowledges that she was the employee who wrote up the paper receipt for Jennings, which confirmed his purchase of two cell phones.[4]  Smith nonetheless maintains that she did nothing beyond filling out the information on the paper receipt. Smith Dep. at 145-46. She also contends that employees at the store often shared computers, and so she believes that DiPietro accessed Jones's account from Smith's computer. Id. at 148-49. Smith further posits that it was DiPietro who signed the separate wireless service contracts executed for Jennings and Jones on

---

[3] There is no indication in the evidence that Smith ever received approval to access Jones's account.

[4] Jennings's name appears on the paper receipt, but Jones's name does not. However, Jones's cell phone number is listed on the receipt, along with Jennings's. Smith testified that at the time she was writing up the receipt, she did not notice that the cell phone number belonged to her daughter. Smith Dep. at 144-45.

September 28th.[5] Id. at 157-58.

At some point in October, individuals at Cingular began to suspect that Smith had been the representative who accessed her daughter's account. Brenda Adams, who had just began work as a Human Resources Manager at Cingular (her first day was October 15, 2001), was assigned to investigate further. Adams Dep. at 7, 18-19. Thus on October 16, 2001, Adams attended a meeting with Spafford (the store manager), Sparrow (Spafford's boss), Tara Anderson (a human resources executive who was Adams's supervisor), and Smith. Two union representatives were also present.

At the meeting, the Cingular managers explained why they suspected that Smith had accessed her daughter's account. Smith denied having completed the transactions, and she attributed them to DiPietro. The four managers told Smith that they were going to do a full investigation, and that, in the interim, Smith could return to work. Smith Dep. at 154-57.

Following the meeting, Adams set out to determine the key facts. Defendant's 56(a)(1) Stat. at ¶ 37; Plaintiff's 56(a)(2) Stat. at ¶ 37. Adams gathered various company records from Spafford and Sparrow, including the electronic reports which showed that Jones's account had been accessed using Smith's login information and computer. Defendant's 56(a)(1) Stat. at ¶¶ 38-39; Plaintiff's 56(a)(2) Stat. at ¶¶ 38-39. Adams also spoke with DiPietro, who denied doing the transaction. Adams Dep. at 39.[6]

---

[5] The signature is difficult to decipher, but a jury could conclude that it belongs to DiPietro. See Defendant's Exh. L, M.

[6] In her 56(a)(2) Statement, Smith suggests that page 39 of Adams's deposition does not support the cited proposition. Plaintiff's 56(a)(2) Stat. at ¶ 40. That is incorrect, as page 39 includes the following

Adams and DiPietro then went through a stack of sales contracts in DiPietro's possession, and they were unable to find a contract that related to either Jennings or Jones.

Adams (who is African-American) ultimately concluded that Smith had accessed her daughter's account. Adams Dep. at 68-69. According to Adams, she came to this conclusion based on several factors, including the electronic records linking Smith to the phone activations, and the receipts showing that Smith had been involved with the transaction. Id. at 66-67. Adams claims to also have considered the fact that Jones had received her phone at a promotional price (one cent), even though Jones did not qualify for the promotion; Adams maintains that it made no sense to her that DiPietro would have given Jones such a generous discount, especially considering that DiPietro would not have received a commission on that sale. Id. at 66-67. Adams further explained that it did not make sense to her that DiPietro would be using Smith's computer, which was at the back of the store, rather than his own computer, which was much closer to where he would have been interacting with customers. Id. at 65.

Although Adams conducted an investigation, that investigation was perhaps not

exchange:

> Q [by Smith's attorney]. So, after speaking with Mr. Spafford, you spoke to Ryan [DiPietro]?
> A [by Adams]. I did speak to Ryan.
> Q. Why did you decide to speak to Ryan?
> A. Because I wanted to know if maybe there was a mistake, if maybe he made the transaction, and he said he definitely did not.

Smith also tries to refute Adam's testimony by pointing to deposition testimony from DiPietro in which he stated that he was unable to recall what had happened the day of the transaction. This does not refute Adams's testimony that when she first talked to DiPietro in 2001, he denied having any involvement with the transaction.

as exhaustive as it could have been.  At no point did Adams ever talk to anyone about Smith's general performance as an employee, nor did Adams ever look through Smith's personnel file.  Defendant's 56(a)(1) at ¶ 42; Plaintiff's 56(a)(2) at ¶ 42.  Additionally, Adams never contacted Jones or Jennings to get their sides of the story, even though the latter was actually himself a Cingular employee.

While responsibility for the investigation largely fell to Adams, other Cingular managers also played a role.  Spafford had his own discussion with DiPietro about the incident, before DiPietro spoke to Adams.  Adams Dep. at 50.  Sparrow may also have met with DiPietro.  DiPietro Dep. at 25-26.  Because Adams was so new to the company, at times she turned to Anderson for help.  Adams Dep. at 67.

Ultimately, Adams, Sparrow, Spafford, and Anderson, or some subset of that group, concluded that Smith should be terminated.[7]  Thus, on October 25, 2001, Smith was called into a meeting with Sparrow, Adams, and Anderson, and with a union representative.  Plaintiff's Exh. 15.  At the meeting, Smith was told that she was being terminated for violating company policy.

On March 22, 2002, Smith filed a charge of discrimination with the Connecticut Commission on Human Rights and Opportunities ("CHRO").  Smith received a right to sue letter and subsequently brought suit in this court against Cingular.  Under her

---

[7] The record evidence is unclear and conflicting on the exact role that each of these individuals played in the termination decision.  There are indications that the termination decision was made primarily by Sparrow, see Plaintiff's Exh. 25 at 9, or primarily by Anderson and/or Adams, with the concurrence of Spafford and Sparrow, Adams Dep. at 70, 73, or by Anderson, Adams, Sparrow, and Spafford, together as a "group effort," Sparrow Dep. at 22, or primarily by Adams, id. at 31, or primarily by Anderson, Parry Aff. at ¶¶ 11, 14.

Sparrow further guessed that his boss, Impey, might also have been involved.  Sparrow Dep. at 22.  Neither party claims that Impey played a role in Smith's termination.  See Defendant's 56(a)(1) Stat. at ¶ 49; Plaintiff's 56(a)(2) Stat. at 26 n.2.

Second Amended Complaint, and following the court's ruling on Cingular's Motion to Dismiss, see Doc. Nos. 31, 39, Smith's pending claims in this case arise under two statutes: the Americans with Disabilities Act (ADA), 42 U.S.C. § 12111 et seq.; and Title VII, 42 U.S.C. §§ 2000e-2(a), 2000e-3(a). Under both statutes, Smith asserts that she was subjected to a hostile work environment, that she was terminated because of her race and/or disability, and that her termination was retaliation for her complaints of discrimination.

Cingular has moved for summary judgment on all outstanding claims.

## III. ANALYSIS

### A. ADA Hostile Work Environment and Wrongful Termination Claims

As a prerequisite for bringing her hostile work environment and wrongful termination claims under the ADA, Smith must show that she is "disabled" within the meaning of the ADA. Capobianco v. City of N.Y., 422 F.3d 47, 56 (2d Cir. 2005). She therefore has to prove that she had a "physical or mental impairment that substantially limit[ed] one or more of [her] major life activities." 42 U.S.C. § 12102(2)(A).[8] Smith has not met this burden.

As an initial matter, the court notes that Smith's brief is less than clear in specifying exactly which major life activities Smith has trouble performing. However, at times Smith variously indicates that her injury made it difficult to work, get out of bed, and lift and carry items. See Plaintiff's Mem. in Opposition at 26; Smith Dep. at 90-91.

---

[8] The ADA also recognizes that an individual can be "disabled" if she has a record of previously being disabled, or if she is regarded has being disabled. 42 U.S.C. § 12102. Smith has only asserted that she was actually disabled; she has not advanced an argument under the other prongs of the ADA's definition. See Plaintiff's Mem. in Opposition at 25-27.

The court will assume that all of these qualify as "major life activities" within the meaning of the ADA.  Cf. Capobianco, 422 F.3d at 56 (explaining that major life activities can include such activities as, inter alia, working and performing manual tasks).

Nonetheless, Smith has failed to show that her back problem "substantially limits" any of these activities.  To determine if a condition is "substantially" limiting, the court conducts an "individualized inquiry."  Reeves v. Johnson Controls World Servs., Inc., 140 F.3d 144, 152 (2d Cir. 1998).  The court must consider such factors as the nature and severity of the plaintiff's impairment, the duration or expected duration of the impairment, and the permanent or long term impact that the impairment will have for the plaintiff.  Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 643 (2d Cir. 1998).  Moreover, the phrase "substantially limits" must be "interpreted strictly to create a demanding standard for qualifying as disabled," in accordance with Congress's intent in passing the ADA.  Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 197 (2002).  Accordingly, the plaintiff must be significantly limited in her ability to perform major life activities, as judged in comparison to the general population.  Id. at 198; see also Capobianco, 422 F.3d at 57.  Finally, in judging the extent of the plaintiff's impairment, the court must look at the extent of the impairment after accounting for self-mitigating measures, such as medications and other devices.  Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 565-66 (1999).

At her deposition, Smith testified that shortly after she first experienced her back injury, she started getting sharp, aggravating pains when she did things like turn, walk, stand, and bend.  Smith Dep. at 50.  However, she treated her condition with therapy,

muscle relaxers, and exercise, which helped "a little." Id. Today, Smith's injury flares

up infrequently. Id. at 51. Additionally, when those flare-ups occur, Smith takes Tylenol

and applies heat to reduce the pain, which helps. Id. at 56. She concedes that, taking

into account her treatment, she is able to function "pretty much," although she is unable

to stand or sit for extended periods, and she cannot carry large loads. Id. at 56-57.

She also concedes that, because of her pain management techniques, she is generally

able to work through whatever pain she has, and so she doesn't really let that stop her

from doing anything. Id. at 58. Indeed, after Taylor refused to accommodate Smith's

back problems, Smith ended up just working through whatever pain she experienced.

In light of these facts, Smith cannot show that her back injury "substantially

limits" her ability to perform any major life activities. Instead, her limitations are

relatively minor when compared to the abilities of the general population. See

Colwell,158 F.3d at 644 (finding that two plaintiffs did not qualify as disabled even

though they could not sit or stand for long periods of time, and could not lift heavy

objects).

Defendant is entitled to judgment on Smith's hostile work environment and

wrongful termination claims under the ADA because Smith is not disabled.[9]

B.     Title VII Wrongful Termination

Under Title VII, Smith's first claim is that she was fired because of her race. This

claim is analyzed under the burden-shifting framework set out in McDonnell Douglas

---

[9] Smith's ADA retaliation claim is different. To have a retaliation claim under the ADA, a plaintiff need not prove that she was actually disabled at the time she engaged in protected activity. Instead, she needs only a good faith, reasonable belief, that the employer violated the statute. Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 159 (2d Cir. 1999). Cingular has not argued that Smith lacked a good faith, reasonable belief that she qualified as disabled.

Corp. v. Green, 411 U.S. 792 (1973). Under this framework, Smith must first establish a prima facie case of racial discrimination. Graham, 230 F.3d at 39. If she does so, the burden shifts to Cingular to articulate a legitimate, non-discriminatory reason for its actions. Id. Then, if Cingular articulates such a reason, the burden shifts back to Smith to prove that discrimination was the real reason behind her employer's actions. Id.

To establish a prima facie case of discrimination, Smith must demonstrate: (1) that she is part of a protected class; (2) that she was qualified for her position; (3) that she suffered an adverse employment action; and (4) that the circumstances surrounding that employment action give rise to an inference of discrimination. Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001). The Second Circuit has "often emphasized [that] the burden of establishing this prima facie case in employment discrimination cases is 'minimal.'" McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2d Cir. 2001). Nonetheless, the plaintiff still has some burden to come forward with sufficient admissible evidence. See Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 65 (2d Cir. 1997).

Cingular argues that Smith's claim fails on the fourth prong because there is no evidence that any of the individuals who acted to terminate Smith were in any way motivated by racial discrimination. See Defendant's Br. in Support at 19. Relatedly, defendant argues that Smith cannot show that Cingular's explanation for her termination was really a pretext for discrimination. Id.

Smith's discrimination claim starts with her belief that DiPietro was the employee who accessed Jones's account, rather than her. Smith contends that when DiPietro denied his own involvement, he was lying because he had learned of the investigation

and wanted to avoid responsibility for giving Jones an unauthorized upgraded.[10]
Plaintiff's Br. in Opp. at 16. Smith also points out ways in which Cingular's investigation
was lacking, such as the fact that Adams never interviewed Jennings or Jones. Id.

These points fall short of the mark. Smith may be able to show that she was
terminated unjustly, and that Cingular's investigation of the incident was not as
thorough as it could have been. But Smith's burden is to demonstrate that she was
terminated because of her race. See Lizardo v. Denny's, Inc., 270 F.3d 94, 103 (2d Cir.
2001). Indeed, even when a plaintiff has established her prima facie case and shown
that the defendant's explanation for its actions is lacking, the plaintiff will still not survive
summary judgment unless she can show that the defendant's false explanation was
proffered to mask race discrimination. Id. at 103-04. Accordingly, the real question in
this case is not whether Smith was wrongly terminated. Instead, the issue is whether
Smith can link the circumstances of her termination to racial discrimination. If she
cannot, her claim fails for lack of a prima facie case and/or for failure to show that the
employer's explanation was a pretext for racial discrimination.

One way that a plaintiff can create an inference of discrimination is by
introducing evidence that similarly situated individuals of a different race were treated
differently. See, e.g., Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 95 (2d Cir.
1999). These individuals need not be identically situated to Smith to be appropriate
reference points. However, they do need to be similarly situated in all material

---

[10] Smith also suggests that individuals at Cingular "got to" DiPietro. However, the sole evidence
she can muster in support of this allegation is her own testimony that, after she was fired, her union told
her that it could not process a grievance because "someone had gotten to the person that could have
cleared [her] of everything." Smith Dep. at 169. The union's statement is hearsay, and therefore
inadmissible.

respects.  Id.

Smith first claims that similarly-situated, white individuals were treated differently by Taylor.  Plaintiff's Br. in Opposition at 13.  What she means by this, however, is simply that Taylor was extremely quick to discipline Smith for minor infractions, while letting similar (or worse) infractions by white employees go unpunished.  This probably would suffice to show that Taylor harbored discriminatory animus against Smith.  But it is beside the point because there is no evidence that Taylor played any role in Smith's termination.  See Collins v. N.Y. City Transit Auth., 305 F.3d 113, 116-19 (2d Cir. 2002) (finding that a plaintiff did not establish that he had been terminated because of his race, notwithstanding evidence that his supervisor had uttered various racial epithets at him, because the supervisor was not the actual decision maker who terminated him).

Smith next argues that discrimination can be inferred from the fact that she was terminated for a first offense.  Plaintiff's Br. in Opposition at 16.  She points to a statement from Bill Parry, the union official who sat in on the October 16, 2001 meeting, that Parry was unaware of any employee besides Smith whom Cingular had terminated for a first offense.  See Parry Aff. at ¶ 13.

Parry's sparse statement is insufficient to meet the minimal standards of a prima facie case.  Parry gives absolutely no details about what kinds of "first-offenses" he was aware of, such that a fact finder could determine if the relevant individuals were similarly situated in all material respects.  Moreover, Parry gives no information about the races of the other, first-time offenders.  Without such evidence, it is impossible to determine if similarly situated individuals of a different race were treated differently.

Smith also suggests that there have been other Cingular employees who

16

accessed the accounts of their family and friends, and they were not terminated for their violations.  See Plaintiff's Br. in Opposition at 13, 18 (citing Neal Aff. ¶ 21, Plaintiff's Exh. 29).  However, in the examples Smith cites, there is no evidence that any of these violations were ever discovered by management.  There is also no evidence that any of the relevant decision markers in this case were aware of these violations.  Smith's examples are not similarly situated in all material respects.

Finally, Smith believes that discrimination can be inferred from the fact that Adams is African-American.  Smith argues that this fact, coupled with the various inconsistencies from witnesses regarding exactly which official was responsible for Smith's termination, allows a jury to infer that Adams was hired to provide "cover" for Cingular to engage in racial discrimination.  Smith further observes that Cingular's Motion for Summary Judgment relies, in part, on Adams's race in order to argue that it did not discriminate.[11]

This far-fetched argument lacks merit.  Indeed, while Smith is claiming that Cingular assigned Adams a particular role in the investigation because of Adams's race, Smith has noticeably failed to introduce the kind of evidence that would permit such an inference.  For instance, Smith could have introduced evidence that Cingular generally assigns Adams to investigate only black employees.  Or Smith could have tried to show that Adams was assigned to the case instead of other non-black investigators that the company had available.  Yet Smith has introduced no such evidence, and the evidence she has put forward provides no reason to think that

---

[11] Of course, argument of counsel is not evidence.

Adams was assigned to the case because of her race.[12]

In light of the above, Smith has failed to establish a prima facie case of discrimination. A jury might well be able to conclude that Smith's termination was unfair, and that Cingular later gave conflicting explanations for exactly which of its managers was responsible for the termination. But Smith has failed to introduce evidence that gives rise to an inference that she was terminated because of her race. Cingular is therefore entitled to summary judgment on her Title VII wrongful termination claim.

C.    Retaliation

To establish a prima facie case of retaliatory discharge, a plaintiff must prove four elements: (1) she participated in protected activity; (2) the defendant knew of that activity; (3) the plaintiff suffered an adverse employment action; and (4) there is a causal connection between the protected activity and that adverse employment action. Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005). If the plaintiff demonstrates these four elements, the burden shifts to the employer to articulate a legitimate reason for its actions. Id. Then, the burden shifts back to the plaintiff to

_____

[12] To support her claim, Smith cites EEOC v. Ethan Allen, Inc., 44 F.3d 116, 120 (2d Cir. 1994), for the proposition that inconsistencies in an employer's explanation for its actions can be evidence of pretext. That is true enough, but simply showing that there are problems with an employer's story is not sufficient to survive summary judgment. See Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 148 (2000). Instead, evidence of the falsity of an employer's explanation, when coupled with a plaintiff's prima facie case, may be sufficient. See id. Indeed, in Ethan Allen, an age discrimination case, the plaintiff had introduced evidence that his tasks were assigned to younger worker shortly after he was terminated. Ethan Allen, 44 F.3d at 118. Ethan Allen does not hold that mere evidence of inconsistency, absent more, is sufficient to establish that an employment action was racially motivated.

    To apply the logic of cases like Ethan Allen to this situation, where Smith is arguing that Adams was assigned to the case because of Adams's race, Smith would need to introduce in effect the kind of prima facie case Adams would need to present if Adams were herself bringing a race discrimination claim. Smith has not done so, because she has failed to create an inference that Adams was assigned to Smith's case because of Adams's race.

prove that the defendant's stated reason was a pretext for unlawful retaliation.  Feingold
v. New York, 366 F.3d 138, 157 (2d Cir. 2004).

To establish that Smith engaged in protected activity, Smith's Brief relies only on
her March 2000 complaints to union officials.  See Plaintiff's Br. in Opposition at 31-
32.[13]  Cingular, for its part, contends that there is no evidence demonstrating a causal
connection between this complaint and Smith's termination.

Smith argues that the causal connection can be inferred from temporal proximity.
However, while temporal proximity can be used to establish a causal connection, it can
only do so when the protected activity is "very close" in time to a plaintiff's termination.
Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001).  The March 2000
complaints took place about 17 months before Smith was fired.  Without other evidence
of retaliatory motive, this is too long a time period to permit a jury to find the required
causal connection.  See id. at 274 (finding that a 20-month gap between protected
activity and an employment action was insufficient to demonstrate a causal connection);
Hollander v. Am. Cyanamid Co., 895 F.2d 80, 85-86 (2d Cir. 1990) (finding that a three

---

[13] Cingular's brief raised the possibility that Smith might also try to rely on her July 2001 complaint
to Impey as part of her prima facie case.  See Defendant's Br. in Support at 31.  However, in defending
against Cingular's Motion for Summary Judgment, Smith's brief failed to mention this incident.  This
omission parallels Smith's Second Amended Complaint, which also alleges only that Smith was
terminated in retaliation for her March 2000 complaints.  See Doc. No. 31 at 3-4.
    In these circumstances, the court deems Smith to have waived any retaliation claim based on her
July 2001 complaint.  The court notes that this may well have been a strategic decision on counsel's part,
as the evidence shows that Impey was quite receptive to Smith's complaint, and in fact met with Taylor in
an attempt to try to ameliorate the problem.  Indeed, Smith's deposition testimony was that Impey seemed
"genuinely concerned" with what she had to say.  Smith Dep. at 124; see also id. at 126.  Moreover, as
plaintiff does not contend that Impey played a role in her termination, it would be particularly difficult for her
to show that Cingular terminated Smith for a complaint made to him.  Finally, while a jury could conclude
that Sparrow was aware of the July 2001 complaint (Sparrow sat in on the meeting with Taylor where
Impey mentioned Smith's complaint), there is no indication that any of the other key decision makers
(Spafford, Anderson, and Adams) were also aware of it, creating a further obstacle for Smith.

month period was too long to show a causal connection); cf. Gorman-Bakos v. Cornell Coop. Extension of Schenectady County, 252 F.3d 545, 555 (2d Cir. 2001) (declining to "nail down the elusive outer limit" for the length of time that can demonstrate a causal connection).

Because Smith has failed to make out a prima facie case of retaliation, Cingular is entitled to summary judgment on her retaliation claims under the ADA and Title VII.

D.    Title VII Hostile Work Environment

Smith's final claim for relief asserts that she was subjected to a hostile work environment based on her race. In her brief, Smith has further clarified that this claim is limited to the various indignities and criticisms that she suffered at Taylor's hands. See Plaintiff's Br. in Opposition at 34.

Title VII prohibits an employer from discriminating against an individual, on the basis of race, with respect to that individual's "compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1). This means that employees are protected not only from economic discrimination, but also from harassment that is sufficiently severe or pervasive that it alters the terms and conditions of employment. Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986).

To have a successful claim based on a hostile work environment, an employee's treatment must be sufficiently degrading such that reasonable people would find the conduct to be hostile or abusive. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). Additionally, the employee must show that she subjectively perceived the behavior as harassing. Id. at 21-22. Finally, when a plaintiff sues her employer, she must show that "a specific basis exists for imputing the objectionable conduct to the

20

employer." <u>Fairbrother v. Morrison</u>, 412 F.3d 39, 48-49 (2d Cir. 2005).

Cingular argues that any harassment by Taylor was not sufficiently abusive to be actionable.  In Cingular's view, Taylor did no more than treat Smith unfavorably as compared with other employees at the Newington store.

Whether or not a work environment is hostile is something that can only be determined by examining the totality of the circumstances.  <u>Ferris v. Delta Air Lines, Inc.</u>, 277 F.3d 128, 135 (2d Cir. 2001).  Relevant factors include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  <u>Harris</u>, 510 U.S. at 23.  Because a plaintiff need only show that the relevant conduct was sufficiently severe <u>or</u> sufficiently pervasive, even relatively minor conduct can create a hostile work environment when it occurs with sufficient frequency.  <u>See</u> <u>Terry v. Ashcroft</u>, 336 F.3d 128, 149 (2d Cir. 2003).  Moreover, an employee need not show that her conditions became unendurable, or intolerable, or that her psychological well-being was damaged.  <u>Id.</u> at 148.  The question is simply whether the conditions of the employee's job were altered for the worse.  <u>Id.</u> at 149.

In this case, a reasonable jury could conclude that Taylor subjected Smith to a hostile work environment.[14]  Taken individually, none of Taylor's actions would likely be enough to sustain a claim.  However, a jury could find that Taylor did the following: he repeatedly refused to accommodate Smith's back injury, even after being instructed to

---

[14] It is not entirely clear from the evidence if a jury could attribute all of Smith's actions to racial hostility, as is of course required in a Title VII case.  However, Cingular has not advanced such an argument, and so the court will not consider the issue further on summary judgment.

do so by his superiors, with the result that Smith experienced significant pain; he repeatedly criticized Smith's performance, without justification; he repeatedly gave Smith reprimands that were out of proportion to any of her violations; and he intentionally overworked Smith, causing her to become stressed. Taken together, these actions are sufficient to constitute harassment that affected the terms and conditions of Smith's employment.

As an alternative argument, Cingular maintains that Smith's hostile work environment claim is untimely. Defendant's Br. in Support at 32-34. Cingular points out that Smith did not file her CHRO Complaint until March 22, 2002. And in Cingular's view, that came too late relative to any harassment that Taylor inflicted on Smith.

Under Title VII, when a plaintiff files an administrative complaint with a state agency like the CHRO, the plaintiff must file that complaint within 300 days after an unlawful employment practice occurs. 42 U.S.C. § 2000e-5(e). As applied to a hostile work environment claim, however, this does not mean that all hostilities need to take place within the 300-day period. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117 (2002). Instead, so long as "an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." Id.

In this case, the only question is whether some of Taylor's unlawful harassment took place after May 26, 2001. Admittedly, Smith's evidence on this point is less than crystal clear, as her Affidavit does not always attribute specific conduct to Taylor, as

opposed to other managers.[15]  Moreover, when her Affidavit and deposition testimony

do attribute specific conduct to Taylor, it is either for dates before May 26, 2001, <u>see,</u>

<u>e.g.</u>, Smith Aff. ¶¶ 8-11, 20-21, or for unidentified time periods, <u>see, e.g.</u>, Smith Aff.

¶ 22; Smith Dep. at 60.

Notwithstanding Smith's lack of precision, a reasonable jury could conclude that

at least some of Taylor's hostile conduct took place after May 26, 2001.  Importantly, in

late July 2001, Smith complained to Impey about Taylor's conduct.  Based on this

complaint, a reasonable jury could infer that, as of July 2001, Taylor was still subjecting

Smith to hostilities.  Such an inference is of course not compelled, but it is a reasonable

one and sufficient to survive a motion for summary judgment.

Aside from the arguments discussed, Cingular has not advanced any other

reasons supporting entry of summary judgment on the Title VII hostile work

environment claim.[16] The court therefore concludes that summary judgment must be

denied on that claim.

## IV.    CONCLUSION

Cingular's Motion for Summary Judgment [Doc. No. 54] is **GRANTED IN PART**

and **DENIED IN PART**.  Plaintiff's Title VII hostile work environment claim remains in

---

[15] For example, Smith claims in her Affidavit that "[f]alse accusations toward and warnings to me from management continued until my termination on October 25, 2001."  Smith Aff. at ¶ 27.  She does not clearly indicate which of those warnings were attributable to Taylor, and when those occurred.

[16] The court notes that because Taylor was Smith's supervisor, Cingular is at least presumptively liable for his harassment.  <u>See</u> <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 807-08 (1998); <u>see also id.</u> (explaining that if a supervisor's harassment is severe enough that it culminates in a "tangible employment action," the employer is <u>always</u> liable for the supervisor's harassment).  Although such a presumption can be overcome by an affirmative defense, <u>see id.</u> at 807, Cingular has not claimed it is entitled to summary judgment on such an affirmative defense.

the case, but judgment shall enter for the defendant on all other claims.  Cingular's

Motion to Strike [Doc. No. 68] is **GRANTED IN PART**, **DENIED IN PART**, and **DENIED**

**AS MOOT IN PART**.

**SO ORDERED.**

      Dated at Bridgeport, Connecticut this 18th day of August, 2008.


      /s/ Janet C. Hall       
      Janet C. Hall
      United States District Judge